OSCN Found Document:IN THE MATTER OF THE APPLICATION OF THE OKLAHOMA TURNPIKE AUTHORITY

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 IN THE MATTER OF THE APPLICATION OF THE OKLAHOMA TURNPIKE AUTHORITY
2023 OK 84
Case Number: 120619
Decided: 08/01/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2023 OK 84, __ P.3d __

 

 

IN THE MATTER OF THE APPLICATION OF THE OKLAHOMA TURNPIKE AUTHORITY FOR APPROVAL OF NOT TO EXCEED $500,000,000 OKLAHOMA TURNPIKE SYSTEM SECOND SENIOR LIEN REVENUE BONDS, SERIES 2022

ORIGINAL ACTION TO APPROVE STATE REVENUE BONDS

¶0 The Oklahoma Turnpike Authority brought this original proceeding pursuant to 69 O.S.2021, § 1718, requesting that this Court approve revenue bonds to finance the construction of three turnpike projects, update and repair turnpike facilities and infrastructure, refund prior revenue bonds and notes, and pay other costs. Protestants challenged the proposed bonds on several grounds, arguing that the Oklahoma Turnpike Authority lacks legislative authority to construct the three turnpikes. This Court previously assumed original jurisdiction. We approve the proposed bond issue.

ORIGINAL JURISDICTION PREVIOUSLY ASSUMED; 
PROPOSED BOND ISSUE APPROVED.

Jana L. Knott, Bass Law, P.C., Oklahoma City, Oklahoma, for Petitioner.

Jered T. Davidson, The Public Finance Law Group, PLLC, Oklahoma City, Oklahoma, for Petitioner.

Robert E. Norman, Cheek & Falcone, PLLC, Oklahoma City, Oklahoma, for Protestants--Pike Off OTA.

Stanley M. Ward, Noble, Oklahoma, for Protestants--Litigants in Cleveland County Case No. CV-2022-1905.

Richard C. Labarthe, Labarthe & Tarasov, a Professional Association, Oklahoma City, Oklahoma, for Protestants--Litigants in Cleveland County Case No. CV-2022-1905.

Alexey Tarasov, Labarthe & Tarasov, a Professional Association, Norman, Oklahoma for Protestants--Litigants in Cleveland County Case No. CV-2022-1905.

Andrew W. Lester and John E. Dorman, Spencer Fane LLP, Oklahoma City, Oklahoma, for Protestant--City of Norman.

Elaine M. Dowling, Oklahoma City, Oklahoma for Protestants--R. Jon McKay and Jo Deaton McKay.

Winchester, J.

¶1 Petitioner Oklahoma Turnpike Authority (OTA) asks this Court to approve $500,000,000.00 in Oklahoma Turnpike System Second Senior Lien Revenue Bonds pursuant to 69 O.S.2021, § 1718. In determining the validity of the bonds, the two main issues raised by Protestants Pike Off OTA, City of Norman, R. Jon McKay, and Jo Deaton McKay (collectively Protestants) are (1) whether the OTA has the legislative authority to build the proposed route of the South Extension, and (2) whether the OTA has the legislative authority to issue additional bonds to finalize the Oklahoma City Outer Loop (Loop) with the Tri-City Connector and the East-West Connector.

¶2 Protestants first invite the Court to inject itself into the route-making process for a new turnpike location in the vicinity of Norman. Protestants ask that we disapprove an extension and thus deny the proposed route approved by the OTA. For over 30 years, the Legislature has given the OTA discretion to select turnpike routes within the locations authorized by the Legislature. The Court has consistently honored the discretion given to the OTA by the Legislature and allowed the OTA to exercise its judgment as the OTA has the engineering expertise and traffic data to make these complex far-reaching decisions regarding turnpike routes. We uphold the authority given to the OTA to decide routes for turnpikes and conclude that the OTA has the legislative authority to construct the South Extension that conforms to the location generally described in 69 O.S.2021, § 1705(e)(28).

¶3 To hold otherwise would inject this Court into the OTA's decision-making process regarding proposed turnpike routes. The OTA contends the proposed components of the Loop and South Extension will meet the purposes of the OTA to better facilitate vehicular traffic and meet safety needs, as traffic counts have steadily increased for the last three decades. See 69 O.S.2021, § 1701.[1] For example, in 1987, the daily traffic count through the I-35/I-40 corridor was approximately 50,000 vehicles. In 2022, the traffic count had increased to 150,000, producing five accidents per day. It is projected that there will be 300,000 vehicles traversing this major economic corridor by 2050.

¶4 The Court would not only be deciding the validity of the bonds but also substituting the OTA's discretion with its own in choosing a route, which the Court has consistently refused to do. The Court--without technical expertise--would be required to perform a turn-by-turn analysis of every proposed turnpike route to determine if it falls within the very general turnpike locations described by the Legislature in 69 O.S.2021, § 1705(e). In other words, the Court would be restricting OTA's authority by performing a more rigorous analysis of the OTA's proposed turnpikes routes than what the Legislature generally described in § 1705(e). Any other conclusion by the Court would further require the OTA to seek approval for every route modification that might be necessary when constructing the proposed turnpikes, leading to protracted litigation and creating uncertainty for Oklahoma bonds in the financial markets.

¶5 Striking down the proposed turnpikes would also affect the entire process of financing and constructing turnpike projects. Prior to the OTA seeking bond validation from this Court, the Legislature authorized the turnpike projects at issue, and the OTA hired engineering and design firms to determine the proposed routes. The OTA's Board of Directors approved these routes with the caveat that the proposed routes were still under design and subject to environmental studies. The OTA has been working with federal and state agencies and local governments in the development of the final design of the proposed turnpike routes. Striking the proposed routes at this juncture and not allowing the OTA to exercise its statutory discretion to determine routes that are feasible and economically sound would not only waste resources already spent but would also lead to additional litigation. For these reasons, this Court stands by the last 30 years of precedence, allowing the OTA the broad authority to determine routes within the locations authorized by the Legislature. The OTA also has the legislative authority under 69 O.S.2021, §§ 1705(f) and 1709(A) to issue additional bonds to finalize the Loop. We therefore approve the proposed bond issue.

BACKGROUND AND PROCEDURAL HISTORY

¶6 To effectively address the issues before us, we must first look at the Oklahoma Turnpike System (System) as a whole. The System currently consists of 11 turnpikes and approximately 632 miles of roadways. Construction for the turnpike projects began in 1950, and since that time, our Court has never disallowed a bond issuance of the OTA.

¶7 The components of the System at issue are over thirty years in the making:

Beginning in 1987, Governor Henry Bellmon and the Legislature aspired to construct new turnpike projects, including what is termed the Loop.

In 1988, the OTA sought validation of its bonds to construct the proposed turnpikes, including components of the Loop, and the Court approved the bonds. In re Application of Okla. Tpk. Auth., 1989 OK 21, 770 P.2d 16.

In 1993, the Legislature authorized the South Extension. See 69 O.S. § 1705(e)(28).

In 2016, the OTA sought validation of its bonds for the Kilpatrick and Kickapoo components of the Loop, and the Court approved the bonds. In re Application of Okla. Tpk. Auth., 2016 OK 124, 389 P.3d 318.

Over the last 33 years, the OTA has completed four components of the Loop and two components of the South Extension.

¶8 In early 2022, the OTA announced a set of new turnpikes and other projects to improve current turnpikes and their infrastructure, titling the project ACCESS[2] Oklahoma. The three new proposed turnpikes are: 1) the Tri-City Connector, running around the west side of the Will Rogers World Airport to I-44; 2) the East-West Connector, connecting the H.E. Bailey Turnpike around Newcastle, heading east on Indian Hills Road to the south of Draper Lake, then heading northeast connecting to the Kickapoo Turnpike and completing the Loop; and 3) the South Extension, running from I-35 west of Slaughterville and north of Purcell, across the South Canadian River and north through Norman, west of Thunderbird Lake, connecting with the East-West Connector.

¶9 The issues in this case involve these last segments to connect and finalize the Loop (the Tri-City Connector and the East-West Connector) and the final segment of the South Extension. These final segments total approximately 35 miles.

¶10 The entirety of the ACCESS Oklahoma plan will use approximately $5 billion in bonds. During a special meeting on June 9, 2022, the OTA adopted a bond resolution, which authorized issuing the first phase of the ACCESS Oklahoma plan for turnpike revenue bonds, not to exceed $1 billion, at 6% interest over 32 years and secured by turnpike revenues and revenues of the Turnpike Trust Fund. The OTA noted that the full faith and credit of the State of Oklahoma is not pledged, the bonds are self-liquidating, and the terms are well inside what is required by statute.[3] See, e.g., Application of Okla. Capital Improvement Auth., 1988 OK 25, 958 P.2d 759.

¶11 On July 11, 2022, the Oklahoma Transportation Commission approved the three proposed turnpike routes for the Tri-City Connector, East-West Connector, and South Extension. The OTA then submitted to the Court its application for the assumption of original jurisdiction and petition for validation of the turnpike bonds. Following this Court's order and 69 O.S.2021, § 1718, the OTA published notice of its application and for the statutorily required hearing. Several protestants filed written objections to the application and appeared at the hearing. On October 2, 2022, this Court assumed original jurisdiction, and on November 28, 2022, the Court held oral argument.

STANDARD OF REVIEW

¶12 The Court has long recognized that its obligation in reviewing bonds is to determine whether the bonds facially violate the law and to examine the legal authority presented by protestants. In re Application of Okla. Tpk. Auth., 2018 OK 88, ¶ 5, 431 P.3d 59, 60-61.

ANALYSIS

¶13 The Legislature conferred upon the Court "exclusive original jurisdiction" to hear and determine the OTA's application. 69 O.S.2021, § 1718. The Court's exclusive original jurisdiction entails:

The Authority is authorized in its discretion to file an application with the Supreme Court of Oklahoma for the approval of any bonds to be issued hereunder, and exclusive original jurisdiction is hereby conferred upon the Supreme Court to hear and determine each such application. . . . If the Court shall be satisfied that the bonds have been properly authorized in accordance with this article and that when issued, they will constitute valid obligations in accordance with their terms, the Court shall render its written opinion approving the bonds and shall fix the time within which a petition for rehearing may be filed. The decision of the Court shall be a judicial determination of the validity of the bonds, shall be conclusive as to the Authority, its officers and agents, and thereafter the bonds so approved and the revenues pledged to their payment shall be incontestable in any court in the State of Oklahoma.

68 O.S. 2021, § 1718. Protestants argue that the bonds are not valid because (1) the OTA lacks statutory authorization to construct the South Extension, and (2) the OTA has exceeded its statutory authorization by seeking an additional bond issue to complete the Loop. We address each argument in turn.

A. The OTA is statutorily authorized to construct the South Extension. 

¶14 In analyzing the authority the Legislature has given the OTA to construct the proposed turnpikes, we must first look at the standard by which we review this authority. Title 69 O.S.2021, § 1901 states:

The provisions of this Code, being necessary for the welfare of the state and its inhabitants, shall be liberally construed to effect the purpose and objects hereof.

We are mandated to liberally construe the OTA's authority found in 69 O.S.2021, § 1705(e). The Legislature gave the OTA the authority:

To construct, maintain, repair, and operate turnpike projects and highways, with their access and connecting roads, at such locations and on such routes as the OTA shall determine to be feasible and economically sound; provided, that until specifically authorized by the Legislature, the Authority shall be authorized to construct and operate toll turnpikes only at the following locations . . . .

(20) All or any part of an Oklahoma City Outer Loop expressway system beginning in the vicinity of I-35 and the Turner Turnpike and extending west into Canadian County and then south to I-40; and then south and east to I-35 in the vicinity of Moore and Norman; and then extending east and north to I-40 east of Tinker Field; and then extending north to the Turner Turnpike to complete the Outer Loop.

. . . .

(28) A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

69 O.S.2021, § 1705(e) (emphasis added).

¶15 The locations listed by the Legislature in the subparts of § 1705(e) include the proposed locations for the Tri-City Connector and East-West Connector in § 1705(e)(20), and the South Extension in § 1705(e)(28). And we must liberally construe these subparts of § 1705(e) regarding the locations and routes of these specific turnpikes authorized by the Legislature.

¶16 The Legislature also gave the OTA broad discretion in determining access routes to the turnpikes. Subsection (j) states as follows:

(j) To designate, except as is provided for herein, the location, and establish, limit and control such points of ingress to and egress from each turnpike project as may be necessary or desirable in the judgment of the Authority to insure the proper operation and maintenance of such project, and to prohibit entrance to such project from any point or points not so designated.

69 O.S.2021, § 1705(j).

¶17 These provisions demonstrate that the Legislature has given the OTA very broad authority to determine routes, including access and connecting roads, within the listed authorized locations. As previously held by this Court, we refuse to strictly construe these legislative authorizations and instead defer to the OTA's technical expertise in determining routes. In re Application of Okla. Tpk. Auth., 1950 OK 208, ¶ 65, 221 P.2d 795, 811.

¶18 Turning to the first issue at hand, Protestants argue for a strict construction of 69 O.S.2021, § 1705(e)(28), concluding the OTA's proposed route for the South Extension is not consistent with or contemplated by subpart (28). The statute provides:

(28) A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

Subpart (28) contains two independent clauses. The second independent clause provides that the OTA should construct the South Extension to move easterly across the South Canadian River toward Norman.

¶19 If the Court is to construe this statute liberally and the OTA has the discretion to determine routes that are feasible and economically sound (like trying to avoid the densest parts of Norman), the Court must take a broader view of the proposed South Extension, rather than a turn-by-turn analysis of the proposed route. Looking at the entire route, from the H.E. Bailey Norman Spur to the end of the South Extension in Norman, the turnpike moves easterly from the Spur to Highway 9 and I-35, then easterly to the South Extension, where the turnpike then crosses the South Canadian River as required in second clause of subpart (28), and then north where it ends in the vicinity of Norman.

¶20 In authorizing bonds for a turnpike between Tulsa and Oklahoma City, the Court held that it was not "concerned with the details of construction of the road or any part thereof except the location of the ends" and approved a turnpike that terminated six miles outside of Tulsa and 15 miles outside the center of Oklahoma City. In re Application of Okla. Tpk. Auth., 1950 OK 208, ¶¶ 64-65, 221 P.2d 795, 811. Here, Norman is only 11 miles north or an approximate eight-minute drive to where the South Extension begins, just north of Purcell.

 

¶21 Even more, the South Extension is an access point to the Kickapoo Turnpike, and the OTA has broad discretion to determine such points of ingress to and egress from each turnpike project. 69 O.S.2021, § 1705(j). We also recognize that the OTA may need to adjust the alignment of the South Extension as it has in previous turnpike projects, including the two most recent bond validation proceedings in 2016 and 2018. For example, the U.S. Bureau of Reclamation denied the OTA's application to cross two sections of its property with the South Extension. However, the U.S. Bureau of Reclamation does not object to the OTA routing the South Extension across certain existing easements if the OTA's use does not interfere with or impact current operation on the easements. The OTA will continue discussions with the U.S. Bureau of Reclamation to adjust the alignment of the South Extension to use the existing easements. Regardless of any further design modifications to the proposed South Extension, we follow our precedent that all matters or questions as to the routes of the proposed turnpikes "will be settled in the future by the Oklahoma Turnpike Authority, within its discretion, or in some other manner, but no such question can affect the validity of this bond issue." Application Okla. Tpk. Auth., 1952 OK 247, ¶ 33, 246 P.2d 327, 332.

¶22 The Legislature has given the OTA broad authority to determine the route for the South Extension that moves easterly from the beginning point at the H.E. Bailey Spur and crosses the North Canadian River to the terminus in the vicinity of Norman. We follow the last 30 years of this Court's precedent liberally construing the OTA's discretion in designating turnpike routes by "not inquir[ing] into the matter for the purpose of demanding why some other route was not chosen." Owens v. Okla. Tpk. Auth., 1954 OK 345, ¶ 5, 283 P.2d 827, 831. We hold the OTA has properly exercised that authority here.

B. The OTA is authorized to issue additional bonds for the construction of the Tri-City Connector and the East-West Connector. 

¶23 The next issue is whether the OTA has legislative authority to issue additional bonds to finalize the Loop with the Tri-City Connector and the East-West Connector. Title 69 O.S.2021, § 1710 authorizes a Trust Agreement with multiple bond issues for multiple projects but one source of revenue to pay the debt. The proposed bonds are being issued pursuant to a Trust Agreement dated February 1, 1989, supplemented and amended by a Twentieth Supplemental Trust Agreement.

¶24 Title 69 O.S.2021, § 1705(f) provides the OTA with the ability to issue turnpike revenue bonds and allows it to pay "all or any part of the cost of any one or more turnpike projects." However, section (f) then limits that provision:

Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S.2021, § 1705(f). The Legislature included section (f) in 1987, requiring the OTA to begin construction on the four proposed turnpikes at the same time--the Cherokee, Creek, Chickasaw, and Kilpatrick turnpikes. The "bonds" for the construction of the proposed turnpikes were to be "one issue" under "one bond indenture." Id.

¶25 The Protestants ask the Court to strictly interpret § 1705(f) to conclude that the OTA was only allowed one bond issue for the entire construction of the four turnpikes. Since the OTA did not construct the entire Loop from the first bond issue in 1989, the Protestants contend that the OTA is barred from issuing any more bonds to construct the Tri-City Connector and East-West Connector.

¶26 The OTA's position is that subsection (f) was only a restriction on the first bonds issued after the Legislature passed the requirement in 1987. The OTA contends that after the first bond issue in 1989 to begin construction of the four proposed turnpikes, subsection (f) also allows the OTA to pay "all or any part of the cost of any one or more turnpike projects." 69 O.S.2021, § 1705(f). And the OTA therefore could and has issued additional bonds to construct additional portions of these turnpike projects.

¶27 We have repeatedly held that the interpretation or construction of an undefined statute by the agency charged with its administration is entitled to the highest respect from the courts, especially when the administrative construction is settled and uniformly applied for several years. Oral Roberts Univ. v. Okla. Tax Comm'n, 1985 OK 97, ¶ 9, 714 P.2d 1013, 1014-15; McCain v. State Election Bd., 1930 OK 323, ¶ 17, 289 P. 759, 762-63. In such cases, the administrative construction will not be disturbed except for very cogent reasons, provided that the construction so given was reasonable. Id. We have opined that an agency's own consistent administrative interpretation for a period of over 20 years must prevail over a contrary interpretation suggested for the first time. Okla. Tax Comm'n v. Liberty Nat'l Bank and Trust Co., 1955 OK 208, ¶ 16, 289 P.2d 388, 392.

¶28 For the past 30 years, the Court has upheld the OTA's interpretation of 69 O.S.2021, § 1705(f) and validated more than one bond issue for the Loop under the Trust Agreement: (1) the OTA sought validation of its bonds (1989 bonds) to construct the first sections of the proposed turnpikes and to refund prior bonds, and (2) the OTA sought validation of its bonds (2016 bonds) under the Trust Agreement for the Kilpatrick Southwest Extension and Kickapoo components of the Loop.

¶29 The Court validated the 2016 bonds relying on § 1709(A) and Application of Oklahoma Turnpike Authority, 1966 OK 139, ¶ 81, 416 P.2d 860, 878, and holding the OTA "has the express legislative authority to issue bonds" and "to combine multiple projects for purposing of issuing bonds." In re Application Okla. Tpk. Auth., 2016 OK 124, ¶¶ 11-12, 389 P.3d at 321; see also 69 O.S.2021, § 1709(A).[4] The Court's ruling upheld the OTA's interpretation of § 1705(f) as only applying to the initial funding and construction of the four proposed turnpikes and allowed an additional bond issue for the turnpike projects. We will again not disturb the OTA's interpretation and the Court's broad construction of § 1705(f) and § 1709(A). We hold both the Tri-City Connector and the East-West Connector are supported by valid legislative authorization.

CONCLUSION

¶30 Title 69 O.S.2021, § 1718 provides that if the Court is satisfied that the bonds have been properly authorized in accordance with Article 17 of the Oklahoma Highway Code of 1968, 69 O.S.2021, § 1701 et seq., the Court shall render its written opinion approving the revenue bonds. The OTA has properly exercised its authority to determine the route for the South Extension. Further, the OTA has legislative authority pursuant to 69 O.S.2021, §§ 1705(f) and 1709(A) to issue additional bonds to finalize the Loop. Accordingly, we approve the revenue bonds. Any petition for rehearing regarding this matter shall be filed within twenty (20) days of the date of this opinion.

ORIGINAL JURISDICTION PREVIOUSLY ASSUMED; 
PROPOSED BOND ISSUE APPROVED.

CONCUR: KAUGER, WINCHESTER, EDMONDSON, GURICH, DARBY (BY SEPARATE WRITING), J.J., AND REIF, S.J.

DISSENT: ROWE, V.C.J. (BY SEPARATE WRITING), KUEHN, J. (BY SEPARATE WRITING), AND HIXON, S.J.

RECUSED: KANE, C.J.

DISQUALIFIED: COMBS, J.

FOOTNOTES

[1] The purpose of the OTA is found 69 O.S.2021, § 1701, which provides:

In order to facilitate vehicular traffic throughout the state and remove the present handicaps and hazards on the congested highways in the state, and to provide for the construction of modern express highways embodying reasonable safety devices including ample shoulder widths, long sight distances, the bypassing of cities and towns, and grade separations at intersecting highways and railroads, the Oklahoma Turnpike Authority, as created in Section 1703 of this title, is hereby authorized and empowered to construct, maintain, repair, and operate turnpike projects as defined in Section 1704 of this title, at such locations as shall be approved by the Transportation Commission, and to issue turnpike revenue bonds of the Authority payable solely from revenues to pay the cost of such projects. The Authority is further authorized and empowered to develop and market alternative uses of the Oklahoma Turnpike Authority Electronic Toll Collection System, and construct, maintain, repair, and operate inter-modal transportation transfer facilities and infrastructure relating thereto, including, without limitation, warehouses and utility facilities and intercity rail transit projects as it shall determine to be feasible and economically sound.

[2] ACCESS stands for Advancing and Connecting Communities and Economies Safely Statewide.

[3] The OTA then submitted its bond application to the Council on Bond Oversight (COBO), seeking provisional and final approval. The COBO granted provisional approval of the bond application, setting out the required conditions for final approval that include (1) the resolution or dismissal of the two actions pending in the District Court of Cleveland County relating to the ACCESS Oklahoma projects, and (2) the approval of the bonds by this Court. This Court has resolved the two actions that were pending in the District Court of Cleveland County. However, due to the time it took to resolve these cases, the provisional approval by the COBO expired on February 5, 2023. The expiration of the COBO's provisional approval has no bearing on the issues before this Court in this matter. The COBO's approval of the bond application is not required prior to the validation of the bonds by this Court. The Legislature has set up two separate approval processes to construct and finance turnpike projects. The Legislature confers upon this Court exclusive original jurisdiction to determine an application by this Court for bond validation to construct and operate turnpikes. 69 O.S.2021, § 1718. The Legislature also gives the COBO the authority to determine whether the purposes for which obligations proposed to be issued by the OTA are for "the furtherance and accomplishment of authorized and proper public functions or purposes of the state or of any county or municipality." 62 O.S.2021, § 695.8(A)(1). However, the COBO does not review the merits of the project. 62 O.S.2021, § 695.8(A)(3). Even with the Court's approval of the bonds in this matter, the OTA must comply with the separate requirements outlined in the Oklahoma Bond Oversight and Reform Act, 62 O.S.2021, §§ 695.1-695.11A, before the OTA can issue turnpike revenue bonds.

[4] Title 69 O.S.2021, § 1709(A) states in pertinent part:

A. The Authority may provide by resolution, at one time or from time to time, for the issuance of turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more turnpike projects. The Authority, when it finds that it would be economical and beneficial to do so, may combine two or more, or any part thereof, or all of its proposed projects into one unit and consider the same as one project to the same extent and with like effect as if the same were a single project.

 

 

DARBY, J., concurring specially:

¶1 Upon application by the Oklahoma Turnpike Authority, the Oklahoma Legislature has mandated that the Court consider and pass upon whether the proposed bonds have been properly authorized in accordance with accompanying statutes and when issued, whether the bonds constitute valid obligations in accordance with their terms. If so, the Court shall render a written opinion approving the bonds and fix a time allowing petition for rehearing. Today, we render such a written opinion - no more and no less.

¶2 The statute does not direct this Court to consider and pass upon proposed turnpike locations. But because so many have argued the Court should consider whether turnpike routes proposed by the Authority are authorized, and because such an argument could conceivably have merit, I offer the following.

¶3 The proposed locations of the turnpikes at issue do not run afoul of the applicable statutes. The Legislature has convincingly expressed its intent that so long as the proposed locations are anywhere relatively close to those described in title 69, section 1705 the Authority's decisions are final. Section 1705(28), for example, reads:

A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

69 O.S. Supp. 2013, § 1705(28) (emphasis added). And Section 1705.1 reads:

When a turnpike has been authorized by law to begin at a point and end at a point, it is hereby authorized to begin in the vicinity of said point and end in the vicinity of such point as described. (Emphasis added).

69 O.S.2011, § 1705.1. So, giving effect to both statutes, the proposed turnpike need only be located in the vicinity of the vicinity of the named points. Vicinity being a relative term, the Turnpike Authority has more than a great deal of discretion in locating turnpikes.

¶4 The Authority has proposed locations which fit within that statutory discretion.

I concur in the majority opinion.

¶5 I concur specially.

 

 

ROWE, V.C.J., with whom KUEHN, J., and HIXON, S.J., join, DISSENTING:

¶1 I dissent from the majority's opinion approving the Oklahoma Turnpike Authority's proposed bond application. I also wholeheartedly disagree with the majority's characterization of the protests filed in this matter as an invitation for this Court to "inject itself into the route-making process"[1] and impose upon the discretion of the Oklahoma Turnpike Authority ("OTA"). The Legislature vested this Court with exclusive original jurisdiction to hear bond applications and determine their validity.[2] Our obligation to review bond applications is well-established. In re Application of Okla. Dev. Fin. Auth., 2022 OK 41, ¶ 9, 510 P.3d 165, 168. We must determine whether the bonds facially violate the law and examine the legal authority presented by the protestants. Id. The Legislature's manifest purpose in conferring this jurisdiction upon us was to ensure that the OTA does not act outside the scope of its authority and discretion and thereby contravene the law of Oklahoma--thus, our review is crucial to our system of checks and balances. To rule upon the legitimacy of the protests filed in this matter--and the valid objections contained therein--is precisely why the Legislature vested this Court with exclusive jurisdiction to review these bond applications.

BACKGROUND

¶2 In February 2022, Transportation Secretary Tim Gatz presented ACCESS Oklahoma, which stands for Advancing and Connecting Communities and Economies Safely Statewide, to the Oklahoma Turnpike Authority ("OTA") Board of Directors. ACCESS Oklahoma is a five billion dollar, fifteen-year long-range plan that addresses ongoing turnpike infrastructure needs, including improvements to existing routes and construction of new routes. The proposed route map of ACCESS Oklahoma projects contains three new construction projects (referred to as the "Tri-City Connector," the "East-West Connector," and the "South Extension") allegedly authorized under the OTA's Enabling Act, 69 O.S.2021 §§ 1701-1736 et seq.

¶3 According to the OTA, the Tri-City Connector and the East-West Connector are the final pieces of the Oklahoma City Outer Loop expressway system ("OKC Outer Loop"), one of several turnpike projects authorized by the Legislature in 1987.[3] Regarding the South Extension, the OTA claims that it constitutes the eastern segment of a turnpike project authorized under 69 O.S.2021 § 1705(e)(28) in 1993.[4]

¶4 On June 9, 2022, the OTA held a special meeting and adopted (1) a Bond Resolution authorizing the issuance of turnpike revenue bonds in an amount not to exceed one billion dollars ($1,000,000,000) to finance the first phase of ACCESS Oklahoma projects; (2) a resolution authorizing the commencement of proceedings before this Court to approve the bonds pursuant to 60 O.S.2021 § 1718; and (3) a resolution authorizing the submission of an application to the Council of Bond Oversight ("COBO") for provisional and final approval of the Bonds.[5] According to the OTA, the proposed bonds will be used to (1) finance a portion of the capital costs associated with the ACCESS Oklahoma projects; (2) refund all or part of the outstanding Oklahoma Turnpike Second Senior Revenue Bonds, Series 2017A, based on market conditions and Junior Obligation Note, Series 2020A; (3) fund capitalized interest; (4) satisfy reserve requirements; and (5) pay costs associated with the issuance of the bonds.

¶5 The OTA submitted a request to the COBO to issue five hundred million dollars ($500,000,000) of Second Senior Revenue Bonds, Series 2022A. On August 9, 2022, the COBO voted to approve the OTA's request subject to certain conditions, including (1) the resolution or dismissal of two actions pending in the District Court of Cleveland County relating to the ACCESS Oklahoma projects, and (2) approval of the Bonds by this Court.

¶6 On August 10, 2022, the OTA filed in this Court its Application for the Assumption of Original Jurisdiction and Petition for Validation of Not to Exceed $500,000,000 Oklahoma Turnpike System Second Senior Lien Revenue Bonds, Series 2022. We issued an order the same day setting the matter for hearing on September 13, 2022, and directing the OTA to provide notice of the hearing to the public in accordance with 20 O.S.2021 § 14.1 and 69 O.S.2021 § 1718. Numerous protestants appeared at the hearing and several filed written objections to the application prior to the hearing. On October 10, 2022, we assumed original jurisdiction for the purpose of considering the OTA's application.

DISCUSSION

¶7 There were four protests filed in this case. The first protest was filed collectively by a group of property owners ("Hirschfeld Plaintiffs") in Cleveland and McClain County whose land would be threatened by eminent domain if the ACCESS Oklahoma projects are approved. On May 18, 2022, the Hirschfeld Plaintiffs brought suit in Cleveland County District Court (Case No. CV-2022-1905) alleging the OTA violated various provisions of the Open Meeting Act, 25 O.S.2021 §§ 301-314. In their protest, the Hirschfeld Plaintiffs asked that we defer ruling on the OTA's application until the alleged Open Meetings Act violations could be resolved. However, since this matter has been pending, the District Court granted summary judgment to the Hirschfeld Plaintiffs. The OTA appealed, and on May 31, 2023, the Court issued an opinion, to which I dissented, reversing the District Court's judgment.[6]

¶8 The second protest was filed by the City of Norman ("City"). City's protest focuses exclusively on the South Extension. City claims that nothing in the text of § 1705(e)(28) authorizes the construction of the South Extension. City further contends that if the OTA wishes to build the South Extension, the OTA has the capacity and should be required to seek express legislative authorization for the project.

¶9 The third protest was filed by Pike Off OTA, Inc. ("Pike Off OTA"). Pike Off OTA contends that § 1705(f) of the Enabling Act prohibits the OTA from building the Tri-City Connector and East-West Connector. Section 1705(f) gives the OTA authority:

To issue turnpike revenue bonds of the Authority, payable solely from revenues, including the revenues accruing to the trust fund created by Sections 1701 through 1734 of this title, for the purpose of paying all or any part of the cost of any one or more turnpike projects. Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S.2021 § 1705(f). Pike Off OTA claims that since there have already been two bond issues used for construction of portions of the OKC Outer Loop, authorized under § 1705(e)(20), the OTA has exceeded its statutory authorization by seeking an additional bond issue to complete the project. Pike Off OTA also claims that the OTA lacks legislative authorization to build the South Extension, citing many of the same arguments as City.

¶10 The fourth protest in this matter was filed by R. John McKay and Jo Deaton McKay ("the McKays"). The McKays also claim that the OTA lacks legislative authorization to construct the South Extension, citing reasons similar to those proffered by City and Pike Off OTA.

¶11 Collectively, these protests raise two questions as to the validity of the proposed bonds: (1) whether the OTA has the requisite statutory authorization to build the South Extension, and (2) whether the language of § 1705(f) prohibits a new bond issue for construction of the Tri-City Connector and East-West Connector as parts of the OKC Outer Loop. Both questions involve matters of statutory interpretation. When interpreting statutory provisions, we observe the following principles:

The goal of any inquiry into the meaning of a statutory enactment is to ascertain and give effect to the intent of the legislature. The law-making body is presumed to have expressed its intent in a statute's language and to have intended what the text expresses. If a statute is plain and unambiguous, it will not be subjected to judicial construction, but will receive the effect its language dictates. Only where the intent cannot be ascertained from a statute's text, as when ambiguity or conflict (with other statutes) is shown to exist, may rules of statutory construction be employed.

Yocum v. Greenbriar Nursing Home, 2005 OK 27, ¶ 9, 130 P.3d 213, 219 (internal citations omitted).

A. THE OTA LACKS STATUTORY AUTHORIZATION TO BUILD THE SOUTH EXTENSION.

¶12 Section 1705(e) of the OTA's Enabling Act empowers the OTA to construct, maintain, repair and operate turnpikes throughout the State. However, this power is limited to those projects expressly authorized by the Legislature in statute. See 69 O.S. § 1705(e)(1)-(35). According to the OTA, its statutory authorization to build the South Extension derives from § 1705(e)(28), which provides for the construction of:

A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

The Legislature authorized this project in 1993.

¶13 All of the protests relating to the South Extension generally adhere to one consistent objection: the proposed route for the South Extension is not consistent with or contemplated by the statutory language of § 1705(e)(28). City described the proposed route of the South Extension as follows:

The "South Extension" would cross the east side of Norman [heading south] from Indian Hills Road, just west of 84th Avenue NE and Lake Thunderbird, south to East Etowah Road, until it turns southwest and crosses the South Canadian River and heads further southward into McClain County and on to I-35 just north of Purcell.

Pike Off OTA describes the route of the South Extension similarly, albeit in reverse:

Section 28 does not authorize the OTA to build a turnpike alignment that would start in the City of Purcell, run northeasterly through rural Cleveland County, continue northerly through virtually the entirety of East Norman, including Lake Thunderbird, and then finally meet with the proposed § 1705(e)(20) East-West Connector in far Northeast Norman at Indian Hills Road.

(emphasis in original).

¶14 The OTA claims that the South Extension constitutes the eastern segment of the project authorized under § 1705(e)(28) because it proceeds "easterly across the South Canadian River to a point in the vicinity of Norman." The OTA also notes that, in instances where other turnpike routes have been challenged, this Court has recognized the OTA's broad discretion to make these determinations.[7]

¶15 At hearing, the OTA noted that the southernmost portion of the South Extension adheres to the language in the final clause of § 1705(e)(28) because it initially moves "easterly across the South Canadian River" and the project still terminates "in the vicinity of the city of Norman."[8] To the extent the South Extension diverges from the statutory authorization in § 1705(e)(28), the OTA claims that those changes fall within its discretion to determine routes.

¶16 In ascertaining legislative intent, we look first to the text of the statute. Yocum, 2005 OK 27, ¶ 9, 130 P.3d at 219. "The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."[9] I find that the text of § 1705(e)(28) does not authorize the construction of the South Extension. The route described by the protestants, which is consistent with the map submitted by the OTA[10], has a number of important characteristics which are not mentioned in the final clause of § 1705(e)(28). Most notably, § 1705(e)(28) makes no mention of the project turning north after proceeding "easterly across the South Canadian River." Likewise, the statute does not indicate that the project should join with the OKC Outer Loop or any other turnpike project or highway system when it terminates "in the vicinity of the city of Norman." Finally, the statute makes no mention of the project connecting with Interstate 35 in the vicinity of Purcell, Oklahoma.

¶17 The statute's level of specificity as to the project authorized under § 1705(e)(28) is notable. The statute provides points of origin ("from a point in the vicinity of Mustang"), landmarks and communities through which the route will proceed ("South Canadian River" and "city of Tuttle"), directional requirements ("southerly" and "easterly"), intersections with other highway systems ("to the H.E. Bailey Turnpike"), and endpoints ("to a point in the vicinity of Norman"). The Legislature clearly had the capacity to adequately describe the route of the South Extension, if the Legislature intended to authorize it. However, I cannot infer any such intent based on the text of § 1705(e)(28).[11]

¶18 On this point, the text of the statute is sufficiently clear, and it is not necessary to look at extrinsic sources such as legislative history.[12] However, if we were to consider legislative history or to inquire into legislative intent outside the bounds of the statute, the outcome would not change. As noted by some of the protestants, in 1999 the Legislature considered a series of amendments to the authorizing statute for the OKC Outer Loop that would have extended the potential scope of the Loop as far south as Purcell.[13] These amendments could have arguably provided authorization for the route now proposed for the South Extension. However, these amendments never received a vote in either chamber of the Legislature.[14] The proposal--and failure--of these amendments is instructive in the present matter: first, the amendments demonstrate that the route proposed for the South Extension was not included in the authorizing statute; and second, to the extent the Legislature considered authorizing such a route by the amendments, it ultimately chose not to do so.

¶19 Finally, I reject the majority's position that the differences in the proposed route for the South Extension from the project described in § 1705(e)(28) fall within the OTA's discretion. It is true that where an authorized turnpike is to be built, this Court will not inquire into the matter for determining why another route was not chosen. See Owens v. Okla. Tpk. Auth., 1954 OK 345, ¶ 5, 283 P.2d 827, 830. However, today's decision erroneously approves the construction of a turnpike project that has not been authorized by the Legislature. The OTA lacks statutory authorization to build the South Extension.

¶20 In its effort to connect the dots, the majority trivializes the ways in which the South Extension diverges from the statutory authorization in § 1705(e)(28). The majority suggests that we look at the "entire route"[15] in order to see how the South Extension adheres to the authorization, but a closer review of the entire route only further reveals that the South Extension was not contemplated by the Legislature. Notably, the H.E. Bailey Norman Spur--the only portion of the route authorized in § 1705(e)(28) already constructed--does not even connect with the South Extension. The Norman Spur projects southeast from the H.E. Bailey Turnpike and joins with Highway 9, which then moves east across Interstate 35 into Norman.[16] The South Extension is completely disconnected from this route. As the majority points out, the South Extension crosses Interstate 35 eleven miles further south, in the vicinity of Purcell.[17]

¶21 In finding that the South Extension is not authorized by statute, we would not be, as the majority suggests, injecting ourselves into the route-making process. We would not be dictating to the OTA the route for the project authorized in § 1705(e)(28). We would simply be acknowledging that the route lacks legislative authorization. The majority's boundless conception of the OTA's authority to determine routes not only undermines the Legislature with respect to this particular project but also threatens to completely untether the OTA from legislative authorization altogether. Under the majority's approach, so long as the OTA can make a speculative argument that a proposed route is authorized in whole or even in part, it is essentially free to construct whatever turnpikes it sees fit. I cannot, in good conscience, endorse such an outcome.

¶22 The majority also claims that we have "consistently refused" to substitute our judgment for the OTA's discretion in choosing turnpike routes and that to hold these routes as unauthorized would inject the Court into the decision-making process. What is left unsaid is that we are not injecting ourselves into this process: the Legislature has required our approval of these bonds, and the issues I raise today are issues that the protestants brought before us. Contrary to the majority's assertion that our precedent of the last 30 years requires us to approve these bonds, I would note that our precedent has not addressed a valid route objection, and our precedent certainly does not lead us to the majority's position today. In fact, not since 1950 have we received a protest regarding a route chosen by the OTA.[18]

¶23 The majority further notes that these routes would alleviate the traffic burden on the Interstate 35 and Interstate 40 corridors, thereby reducing the risk to travelers on the interstates. While there may be a host of good reasons to approve these turnpike projects, the majority's consideration of these factors is a venture into the realm of policymaking, which is far beyond our purview, and is vested exclusively with the Legislature.

¶24 Finally, the majority opines that we are mandated to liberally construe the OTA's authorization found in 69 O.S. § 1705(e). What the majority ignores is the limiting language of § 1705(e), which says: "[U]ntil specifically authorized by the Legislature, the Authority shall be authorized to construct and operate toll turnpikes only at the following locations [....]" (emphasis added). No liberal construction of this language can lead us to conclude that an unauthorized route should be approved.

B. THE LEGISLATURE HAS NOT AUTHORIZED ISSUANCE OF ADDITIONAL BONDS FOR CONSTRUCTION OF THE TRI-CITY CONNECTOR AND THE EAST-WEST CONNECTOR.

¶25 Pike Off OTA argues that the OTA lacks authority to construct the Tri-City Connector and the East-West Connector because the OTA has already exceeded the number of bond issues authorized under § 1705(f) for construction of the OKC Outer Loop. The Legislature in 1987 granted the following authority to the OTA:

To issue turnpike revenue bonds of the Authority, payable solely from revenues, including the revenues accruing to the trust fund created by Sections 1701 through 1734 of this title, for the purpose of paying all or any part of the cost of any one or more turnpike projects. Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S.2021 § 1705(f) (emphasis added). Pike Off OTA contends that the OTA's application must be rejected based on this language because the OTA has already issued bonds for construction of the OKC Outer Loop on other occasions, namely in 1989 and 2016.[19]

¶26 The OTA claims that it satisfied the mandate of § 1705(f) with the 1989 bond issue that was used to construct parts of the OKC Outer Loop and the other projects referenced in § 1705(f).[20] The OTA also claims it consolidated all of the bonds under one trust agreement, thus satisfying the requirement that they be financed and operated under one bond indenture.

¶27 In determining the meaning and effect of § 1705(f), we look first at its text. The text of § 1705(f) is explicit in that it limits financing of the OKC Outer Loop project to one bond issue directed at all of the projects referenced in § 1705(f).[21] Nothing in the text of the statute alludes to the prospect of multiple bond issues in various phases over the course of more than thirty years. Nor does the statute authorize a bond issue directed solely at completing a portion of the OKC Outer Loop.

¶28 The OTA's argument that it has complied with § 1705(f) is not persuasive. Even if the OTA is correct that it has satisfied the "one bond indenture" requirement in § 1705(f) because the proposed bonds here would operate under the same trust agreement as those issued previously, the OTA still lacks statutory authorization for the proposed bond issue. The text of § 1705(f) expressly limits funding for the four projects mentioned to one bond issue. The proposed bonds constitute a subsequent bond issue which is beyond the statute's authorization.

¶29 While the text of § 1705(f) is sufficiently clear to resolve this question--and it is not necessary to look beyond the statute's text--Pike Off OTA has submitted compelling evidence of the Legislature's intent in 1987, which further supports the conclusion that this bond issue is not permitted. Specifically, Pike Off OTA submitted a series of news articles from 1988 referencing the projects in § 1705(f) and describing the financing and construction of the projects as an "all-or-nothing proposition."[22] They further explain that the prospect of funding all four projects at one time was infeasible and reference legislative attempts to remove some of the limitations imposed by § 1705(f).[23]

CONCLUSION

¶30 The majority's decision confers upon the OTA incredibly broad discretion without any cognizable limits. The OTA is apparently free to blatantly disregard the Legislature's directives with respect to routes and funding. This decision does not simply approve the proposed bonds, it sets a new precedent that future bond applications seeking our approval are merely seeking our rubber stamp--which we freely give today. I find the majority's holding to be plainly contrary to Oklahoma law, and as such, I must respectfully dissent.

FOOTNOTES

[1] Majority Op., ¶ 2.

[2] 69 O.S.2021 § 1718.

[3] Section 1705(e) of the Enabling Act limits the OTA's authority to only construct and operate turnpikes at specific locations designated by the Legislature. One of these authorized projects includes:

All or any part of an Oklahoma City Outer Loop expressway system beginning in the vicinity of I-35 and the Turner Turnpike and extending west into Canadian County and then south to I-40; and then south and east to I-35 in the vicinity of Moore and Norman; and then extending east and north to I-40 east of Tinker Field; and then extending north to the Turner Turnpike to complete the Outer Loop.

69 O.S.2021 § 1705(e)(20).

[4] Section 1705(e)(28) provides for the construction of:

A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

[5] Around this time, the proposed routes for the Tri-City Connector, East-West Connector, and South Extension were submitted to the Transportation Commission for approval, in accordance with 60 O.S.2021 § 1701. The routes were approved at the Commission's July 11, 2022 meeting.

[6] Hirschfel v. Oklahoma Turnpike Authority, 2023 OK 59 (mandate pending) (Rowe, V.C.J., dissenting).

[7] See In re Application Of Okla. Tpk. Auth., 1950 OK 208, ¶ 65, 221 P.2d 795, 811. In that case, one of the protestants challenged the proposed route of a turnpike between Oklahoma City and Tulsa because the route did not terminate in the business districts of the respective cities but rather at a point six miles outside business district of Tulsa and a point fifteen miles outside the business district of Oklahoma City. We rejected that challenge as "impracticable" and affirmed the OTA's discretion to determine routes for authorized projects:

[W]e assume it to be within the discretion of the proper authorities to so construct such a toll road and to so construct this toll road. It does not appear that this point presents the slightest abuse of discretion, and certainly it does not disclose any violation of the Turnpike Act ....

Id.

[8] The OTA's position on this point is that the South Extension is but one phase of the project authorized under § 1705(e)(28) in its final clause. The OTA does not argue that the South Extension comprises any portion of the project authorized under the first clause of § 1705(e)(28): "A new turnpike or bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle ...."

[9] Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 56 (2012)).

[10] See Appendix of Petition, Vol. II, Exhibit V. Below is a copy of the project maps submitted by the OTA: 

[11] Patterson v. Beall, 2000 OK 92, ¶ 24, 19 P.3d 839, 845 ("[T]he maxim 'expressio unius est exclusio alterius' that the mention of one thing in a statute impliedly excludes another thing, is used to determine legislative intent.").

[12] As Justinian noted: A verbis legis non est recedendum ("Do not depart from the words of the law"). Scalia & Garner, supra, at 56.

[13] Pike Off OTA submitted copies of two pieces of legislation, HB 1459 and SB 371, which would have amended the authorizing language for the OKC Outer Loop to require or at least allow the point at which the southern half of the Loop intersected with Interstate 35 to be somewhere in the vicinity of Purcell. See H.B. 1459, 47th Leg., 1st Sess. (Okla. 1999); S.B. 371, 47th Leg., 1st Sess. (Okla. 1999).

[14] See Pike Off OTA's Appendix to Protest, Exhibits U and V. According to their respective Bill Information pages obtained on the Legislature's website, neither HB 1459 nor SB 371 made it out of committee, nor received a vote in either chamber.

[15] Majority Op., ¶ 19.

[16] Id.

[17] Id.

[18] See e.g., Application of Okla. Tpk. Auth., 1950 OK 208, 221 P.2d 795.

[19] I agree with Pike Off OTA that our approval of the OTA's 2016 bond application to construct portions of the OKC Outer Loop in In re Application of the Oklahoma Turnpike Authority, 2016 OK 124, 389 P.3d 318, has no precedential value for the current protest. Our established practice in reviewing bond applications is to limit our review to those challenges presented by the protestants. See In re Application of Okla. Dev. Fin. Auth., 2022 OK 41, ¶ 9, 510 P.3d 165, 168. We do not conduct an independent inquiry into the validity of the bond application. In 2016, the sole protestant did not challenge the bond application on grounds that it constituted a subsequent bond issue in violation of § 1705(f). Thus, we did not address that question. Notably, the protestant in that case did challenge the requirement in § 1705(f) that the four turnpike projects be funded through the same bond issue as violation of the single subject rule in Okla. Const., art. 5, § 57. We rejected that challenge, but I do not find our holding on that question relevant in the present matter.

[20] The OTA did not address § 1705(f) in its brief in support, but it did briefly address Pike Off OTA's arguments during the September 13, 2022 hearing.

[21] Scalia & Garner, supra, at 69 ("Words are to be understood in their ordinary, everyday meanings--unless the context indicates that they bear a technical sense.").

[22] See Pike Off OTA's Appendix to Protest, Exhibits I, J, K, L, M; Price Tag May Slow Turnpikes, Sapulpa Daily Herald, Feb. 10, 1988 ("A law passed by the 1987 Legislature permits the authority to build the Oklahoma City, Tulsa and Chouteau-Siloam Springs roads only if it also builds a turnpike from Davis to Henryetta."); Paul English, Splitting Toll Road Package Urged, The Daily Oklahoman, Mar. 18, 1988, at 25 ("[T]he 1987 law requires that at least part of four proposed turnpikes be included in the financing package."); Ron Jenkins, Fuss Over 2-Lane Turnpike Idea Heats Up, Oklmulgee Times, Aug. 26, 1988 (quoting Governor Henry Bellmon as describing the four turnpike projects as an "all-or-nothing proposition."); Paul English, Leg of City Turnpike Proposed, The Daily Oklahoman, Apr. 22, 1988 ("The 1987 Legislature approved building of four toll roads, but only if part or all of the four roads were built at the same time."); John Grelner, Bellmon Seeks Turnpike Study, The Daily Oklahoman, Aug. 8, 1988 ("Under current law, only one turnpike bond indenture can be issued for that package which includes a north outer loop in Oklahoma City, a south bypass in Tulsa, a turnpike from to Tulsa to the Arkansas border, and one from Ada to Davis.").

[23] See Pike Off OTA's Appendix to Protest, Exhibits N and O; Legislators May Weigh Solution to Turnpike Issues, The Daily Oklahoman, July 5, 1988 ("Bellmon has said he would like to see all the turnpikes built, but recent studies again have shown the Davis route to be unfeasible."); Tim Chavez, State Economic Growth Bill Killed, The Daily Oklahoman, July 14, 1988.

 

 

KUEHN, J., DISSENTING:

¶1 The Majority suggests that this Court must authorize OTA's requested bonds. The Majority further suggests that, despite being directly asked to determine whether the proposed routes are authorized by statute, this Court should not question the proposed routes, but should defer to an agency, the Oklahoma Turnpike Authority.

¶2 I disagree. First, I would find Title 69, Section 1718, requiring this Court to approve OTA bonds, improperly delegates executive authority to this Court and is unconstitutional. The Oklahoma Constitution gives this Court appellate jurisdiction over civil cases at law and in equity, and original jurisdiction including "general superintending control over all inferior courts and all Agencies, Commissions and Boards created by law." Ok. Const. art. 7, § 4. The statute requires the Court to perform a ministerial duty which is not within the scope of our constitutional role of traditional judicial review.

¶3 Second, if we are to give effect to Section 1718, we must determine the merits of any protests to the bond issue. This Court may exercise its discretion to determine whether any given proposal should be approved. And implicit in the authority to approve is the authority to disapprove.

This Court Should Not Issue an Advisory Opinion on Bond Approval

¶4 The ACCESS Oklahoma proposal has generated significant controversy and many lawsuits. However, the matter before us does not arise from any legal case or controversy. When the Legislature gave the OTA the authority to issue bonds, it included two layers of oversight. The first was unremarkable: any bond issue must be approved by the Council of Bond Oversight. 69 O.S. § 1709(G). The second, however, was highly unusual: the OTA must apply to this Court for bond approval. 69 O.S. § 1718. Under Section 1718, this Court has exclusive jurisdiction to hear and determine an OTA bond application and any protests made to it; if the Court is satisfied that the bonds are authorized in accordance with law and will, on their terms, constitute valid obligations, it "shall render its written opinion approving the bonds. . . ."[1] 69 O.S. § 1718.

¶5 This Court has never been asked to decide the underlying premise of section 1718 itself. In the years after the Turnpike Act was first enacted, protesters argued that the notice provisions connected to OTA's applications to this Court were insufficient to satisfy due process. We held that the provisions for a hearing, timely notice by publication, and appearances at the hearing to register protest, combined with the opportunity for briefing on protest issues, written offers of proof, and argument, satisfy due process concerns. In re Oklahoma Tpk. Auth., 1950 OK 208, ¶¶ 72-75, 221 P.2d 795, 811-12; In re Application of Oklahoma Tpk. Auth., 1966 OK 139, ¶¶ 17-18, 416 P.2d 860, 867.

¶6 In 1950, when first concluding there was no due process violation, this Court mentioned in passing an 1896 United States Supreme Court case, Tregea v. Board of Directors of Modesto Irrigation Dist., 164 U.S. 179 (1896). There, the California Legislature had authorized irrigation districts to issue bonds and provided for a judicial determination of the bonds' validity. After an election at which voters approved the bonds, the irrigation district board filed a petition for a judicial determination of validity. Our opinion appeared to use Tregea as justification for the constitutionality of Oklahoma's law requiring this Court to conduct a bond validation proceeding. However, that is not at all what Tregea held.[2] Before reaching any substantive issue, the Supreme Court asked whether there was a case or controversy "such as can be submitted to and can compel judicial consideration and judgment." Id. at 185. The Court determined that the California procedure, in which the board submitted a bond proposal for judicial validation before any bonds had issued, was merely a measure to secure evidence of the regularity of the irrigation district proceedings. Id. at 186. The evidence secured before the district court might be used in some further adversary action, but the hearing in district court was not itself an adversary proceeding. As there was no case or controversy for the Supreme Court to determine, the appeal was dismissed. Id. at 189. That is, the state legislature might have provided that a district court hold a ministerial fact-finding hearing, but the hearing did not constitute a judicial proceeding, and its findings and conclusions had no binding legal effect on future adversary proceedings. The district courts were not exercising a judicial function.

¶7 Over the years, various members of this Court have come to the same conclusion. In 1989, this Court approved bonds for the four turnpike projects outlined in Title 69, Sections 1705(e), (f). In re Appl. of Oklahoma Tpk. Auth., 1989 OK 21, 770 P.2d 16. Much like the Majority today, the majority opinion in 1989 explicitly rejected any suggestion that this Court should entertain arguments about feasibility, profit, and utility in a proceeding to approve a bond issue. Id. ¶ 13, 770 P.2d at 21. Consequently, the Court limited itself to finding that the bond issue was legally and properly authorized, that the protesters had notice and an opportunity to be heard, and that the grounds of protest were considered. Id. ¶ 22, 770 P.2d at 23. Justice Wilson, joined by Justice Kauger, specially concurred by reason of stare decisis; she noted that the Legislature failed to either provide any judicial standard of review or specify that the Administrative Procedures Act applied, leaving this Court "constrained to approve" the bonds. Id. ¶ 1, 770 P.2d at 24 (Wilson, J., specially concurring). Justice Opala went even further. In explaining why he did not participate in the decision, he stated, "the court today is called upon to reexamine a purely executive decision." He continued,

"For all practical purposes, the court's function today is statutorily confined to a four corners' examination of documentation compiled by the agency acting in a nonadjudicative capacity. By force of applicable law the protests are thus restricted to the facial correctness of the agency's paperwork. There is no opportunity for any meaningful forensic inquiry into the quality of the agency's decisionmaking that preceded its resolve to issue the bonds. . . . Because the task I am called upon to perform leaves me no range of judicial alternatives and hence appears as but an empty act of supererogation, I abstain from sitting in consideration of this cause."

Id. ¶ 1-2, 770 P.2d at 24 (Opala, V.C.J., not participating) (emphasis in original).

¶8 In 2018, Justices Wyrick and Colbert dissented from the Court's opinion approving turnpike bonds, stating, "The Court lacks jurisdiction to render this advisory opinion." In re Application of Oklahoma Tpk. Auth., 2018 OK 88, 431 P.3d 59, 62 (Wyrick, J., dissenting). In that proceeding, the bond issue drew no protests. The Majority briefly noted that no one claimed the project violated the statutes or constitution; as OTA did not appear to exceed its authority and the bonds did not facially violate the law, the Court did not engage in further research. Id. ¶ 5, 431 P.3d at 60-61. Without a legally or factually supported reason to disapprove the application, it was granted. Id. ¶ 7, 431 P.3d at 62.

¶9 I agree with Justices Opala, Wyrick, Colbert, Wilson, and Kauger. Section 1718 provides this Court with no case or controversy, nothing to determine, nothing to decide. We are not an adjunct of the executive branch, and we should not act as a rubber stamp, approving the paperwork for purely executive decisions. In fact, the final clause of Section 1718 makes this Court's approval worse than a rubber stamp. The statute provides that our decision is "conclusive" and "thereafter the bonds so approved and the revenues pledged to their payment shall be incontestable in any court in the State of Oklahoma." 69 O.S. § 1718. So, our purely ministerial action, taken without any judicial discretion or merits review, absolutely forecloses any future state court challenge to either the bonds or revenue. If there is no federal question -- and, usually, a state bond issue for state turnpike projects will raise state law questions -- there is no possibility of judicial review. No other agency, entity or branch of government is charged with oversight of OTA. Taken together, the provisions of Section 1718 ensure that OTA operates independently with no oversight. That may well be the Legislature's intention. But facilitating that is not the business of this Court.

The Bond Issue is Not Authorized by Statute

¶10 Interpreting Section 1718 to allow this Court some judicial discretion, I would not approve the bond request. In 1987, the Legislature granted the OTA limited authority to issue bonds:

To issue turnpike revenue bonds of the Authority, payable solely from revenues, including the revenues accruing to the trust fund created by Sections 1701 through 1734 of this title, for the purpose of paying all or any part of the cost of any one or more turnpike projects. Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S. § 1705(f) (emphasis added). The referenced Section 1705(e) subparagraphs (10), (20), (21) and (22), taken together, authorized construction of specific separate turnpikes, including the Oklahoma City Outer Loop. That is, the explicit language of Section 1705(f) includes the Tri-City Connector, East-West Connector, and South Extension Outer Loop sections proposed by ACCESS Oklahoma and at issue here.

¶11 Any interpretation of a statute starts with the text, and I find the text of Section 1705(f) is unambiguous. The explicit language limits financing of the Outer Loop project to a single bond issue in combination with the other specified projects. It suggests neither that the Outer Loop may be funded by a separate, single issue, nor that the OTA may seek multiple bond issues over the course of the more than thirty years since Section 1705(f) was enacted.

¶12 In 1989, this Court approved the OTA's request for a single bond issue to construct turnpike sections under all four subsections as required by Section 1705(f). In re Appl. Oklahoma Tpk. Auth., 1989 OK 21, ¶¶ 22-23, 770 P.2d 16, 23. The OTA argues that Section 1705(f) merely restricted the first bond issue -- the one we approved in 1989 -- to a single bond and argues that it is thus free to issue additional bonds for separate projects, including projects on the same turnpikes. That is, OTA argues that the purpose of Section 1705(f) was fulfilled with the 1989 bond issue, and it no longer applies to any OTA bond application. The OTA suggested to this Court in oral argument that the initial requirement to join all four projects in a single bond was a political measure of convenience, to ensure that all four turnpikes were built -- or at least begun, since some were more popular than others. But, OTA argued, the Section 1705(f) restriction did not require it to complete those roads on the single bond. I find this interpretation unconvincing. The Legislature told the OTA that it wanted the State to fund building a wagon, and it had to build the wagon all at once under one bond series. But the OTA believes that it only needed to build a cart with two wheels, returning without restriction to issue unlimited bond series for unlimited projects so it could build the legislatively mandated wagon at any time, for any price, and anywhere it wanted to build. Thirty-four years after legislative authorization to issue one bond to build a wagon, the wheels are falling off the cart.

¶13 I am satisfied that the text of Section 1705(f) does not authorize these bonds. However, the protesters also offered evidence of the Legislature's intent to tie all the construction to a single bond. News articles from 1988 describe the financing and construction of the turnpike projects. A Sapulpa paper noted that the law allowed the Oklahoma City, Tulsa and Siloam Springs turnpikes only if one was also built from Davis to Henryetta. Price Tag May Slow Turnpikes, SAPULPA DAILY HERALD, Feb. 10, 1988. The Oklahoman reported that the OTA asked legislators to repeal Section 1705(f), as it required turnpikes to be "built as a package or not at all", that Governor Bellmon said without a change in the law "we won't be able to do anything." Paul English, Splitting Toll Road Package Urged, THE DAILY OKLAHOMAN, Mar. 18, 1988 at 25. Legislators were asked to remove or amend a provision "that if one of the turnpikes was shown to be unfeasible, none of the other three could be built"; but that bill was rejected on the last day of the 1988 legislative session. Legislators May Weigh Solution to Turnpike Issues, THE DAILY OKLAHOMAN, July 5, 1988; Tim Chavez, State Economic Growth Bill Killed, THE DAILY OKLAHOMAN, July 14, 1988. Later that summer, Governor Bellmon stated, "It's the Legislature that has tied all four of these facilities together and made it an all-or-nothing proposition." Ron Jenkins, Fuss Over 2-Lane Turnpike Idea Heats Up, OKMULGEE TIMES, Aug. 26, 1988.

¶14 The Majority fails to address either the plain statutory language or contemporary reporting, let alone refute them. Instead, the Majority argues that this Court should defer to OTA's own interpretation of Section 1705(f). I agree that under our current caselaw, a court should usually defer to an agency's consistent prior interpretation of a statute, unless we are given cogent reasons not to.[3] Oral Roberts Univ. v. Oklahoma Tax Comm'n, 1985 OK 97, ¶ 9, 714 P.2d 1013, 1014-15. Even under our current test to review an agency's interpretation of a statute, this Court at least understands that "[w]hile agency decisions are due some deference . . . courts do not hear cases merely to rubber stamp agency actions. To play that role would be tantamount to abdicating the judiciary's responsibility." Scott v. Oklahoma Secondary Sch. Activities Ass'n, 2013 OK 84, ¶ 34, 313 P.3d 891, 903 (quoting Conservation Law Foundation v. Evans, 209 F.Supp.2d 1, 8 (D.D.C. 2001)). But this deference doctrine doesn't even apply here, because there's been no decision regarding multiple bond issues. The Majority finds that this Court and OTA have consistently allowed multiple bond issues under Section 1705(f). But neither this Court nor the OTA has addressed this in the last thirty years. The OTA has simply ignored the statute. We cannot give deference to the OTA interpretation of the statute, as the OTA's argument is that the one-bond restriction in Section 1705(f) does not apply to this proposal, and that since 1989 OTA has been free to request other bonds. This isn't an interpretation of the statute. It's a rejection of it.

¶15 And this Court has never interpreted this aspect of Section 1705(f). I don't dispute that this Court has consistently approved OTA's bond requests, including a request involving construction of part of the Oklahoma City Outer Loop under Section 1705(f). In re Application of Oklahoma Tpk. Auth, 2016 OK 124, 389 P.3d 318. However, no protester in previous cases raised this challenge to the requirement for one bond issue. As a rule, this Court does not conduct an independent review of a bond proposal but limits our review to any challenge raised in a protest filed with this Court. In re Appl. Of Oklahoma Dev. Fin. Auth., 2022 OK 41, ¶ 9, 510 P.3d at 168-69. The bond series issue was not before us in 2016. It is now. Taken together, the plain language of the statute and evidence of legislative intent do not permit the additional bond issue -- or future unlimited bond issuances- like the OTA has requested here.

¶16 Of course, OTA's bond request encompasses more than just ACCESS Oklahoma and the Tri-City Connector, East-West Connector, and South Extension Outer Loop sections. In theory, we might consider separating out those components of the overall proposal and approve the portion of the bonds that apply to the remainder of the bond requests. However, OTA has neither suggested that the bond request is severable or provided any authority for severing portions of the application. Consequently, I would not approve the bond application.

¶17 Because I would not approve the bonds, there is no need to address the question of the South Extension. I dissent.

FOOTNOTES

[1] This requirement was previously codified at 69 O.S. § 668. That statute, replaced by Section 1718 in 1968, actually granted the Court broader jurisdiction over matters concerning OTA bond approval than it currently possesses. The Court was given exclusive original jurisdiction to determine "the validity of such Trust Fund and the earmarking of revenues thereto, the validity of a pledge thereof by the Authority as provided in this Act, and any other questions as to the constitutionality or validity of this Act. . . ." 69 O.S. § 668. Consequently, the Court's decisions under that statute address substantive issues as well as approval of the bonds.

[2] The irrigation district board of directors determined a bond issue was necessary; voters approved the bonds in a special election; subsequently, the board ordered the bonds to be issued. After a protest, the board excluded some acreage from the district and ordered a new bond issue. After that order, the board petitioned the district court for a judicial determination that the new proposed bonds were valid. The case was tried, testimony and argument were heard, and the trial court filed written findings of fact and conclusions of law. After the testimony, the board amended the petition to include the original proposed bond issue, without public notice. Tregea, 163 U.S. at 182-183 (Synopsis). The actual issue on appeal was whether approval of both bond issues deprived the protestant of property without due process.

[3] Eventually I believe this Court should revisit its case law on agency deference under the Oklahoma Constitution and Oklahoma statutory authority. For a discussion on State Supreme Courts and judicial deference to administrative agencies see Jeffery S. Sutton Who Decides? States as Laboratories of Constitutional Experimentation, Chapter 6 sec.(C) (Oxford 2021).

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1988 OK 25, 764 P.2d 880, 59 OBJ 657, 
Stamford Energy Companies, Inc. v. Corporation Com'n of State
Cited

 
1989 OK 21, 770 P.2d 16, 60 OBJ 312, 
Oklahoma Turnpike Authority, Application of
Discussed at Length

 
1952 OK 247, 246 P.2d 327, 206 Okla 617, 
APPLICATION OF OKLAHOMA TURNPIKE AUTHORITY
Discussed

 
1954 OK 345, 283 P.2d 827, 
OWENS v. OKLAHOMA TURNPIKE AUTHORITY
Discussed at Length

 
1955 OK 208, 289 P.2d 388, 
OKLAHOMA TAX COM'N v. LIBERTY NAT. BANK & TRUST CO
Discussed

 
1966 OK 139, 416 P.2d 860, 
APPLICATION OF OKLAHOMA TURNPIKE AUTHORITY
Discussed at Length

 
2000 OK 92, 19 P.3d 839, 71 OBJ 3016, 
PATTERSON v. BEALL
Discussed

 
2005 OK 27, 130 P.3d 213, 
YOCUM v. GREENBRIAR NURSING HOME
Discussed at Length

 
1930 OK 323, 289 P. 759, 144 Okla. 85, 
McCAIN v. STATE ELECTION BD.
Discussed

 
2013 OK 84, 313 P.3d 891, 
SCOTT v. OKLAHOMA SECONDARY SCHOOL ACTIVITIES ASSOCIATION
Discussed

 
2016 OK 124, 389 P.3d 318, 
IN THE MATTER OF APPLICATION OF THE OKLA. TURNPIKE AUTHORITY
Discussed at Length

 
2018 OK 88, 431 P.3d 59, 
IN THE MATTER OF THE APPLICATION OF THE OKLAHOMA TURNPIKE AUTHORITY
Discussed at Length

 
2022 OK 41, 510 P.3d 165, 
IN THE MATTER OF APPLICATION OF THE OKLA. DEVELOPMENT FINANCE AUTHORITY
Discussed at Length

 
2023 OK 59, 
HIRSCHFELD v. OKLAHOMA TURNPIKE AUTHORITY
Cited

 
1950 OK 208, 221 P.2d 795, 203 Okla. 335, 
In re OKLAHOMA TURNPIKE AUTH.
Discussed at Length

 
1998 OK 25, 958 P.2d 759, 69 OBJ 1183, 
In Re: OKLAHOMA CAPITOL IMPROVEMENT
Cited

 
1985 OK 97, 714 P.2d 1013, 56 OBJ 2777, 
Oral Roberts University v. Oklahoma Tax Com'n
Discussed at Length

Title 20. Courts

 
Cite
Name
Level

 
20 O.S. 14.1, 
Application for Evidences of Indebtedness
Cited

Title 62. Public Finance

 
Cite
Name
Level

 
62 O.S. 695.1, 
Short Title
Cited

 
62 O.S. 695.8, 
Duties of Council of Bond Oversight
Discussed

Title 69. Roads, Bridges, and Ferries

 
Cite
Name
Level

 
69 O.S. 1701, 
Purpose - Authority to Construct, Maintain, Repair and Operate Projects
Discussed at Length

 
69 O.S. 1705, 
Authority - Powers and Duties
Discussed at Length

 
69 O.S. 1705.1, 
Beginning and Ending Point of Authorized Turnpikes
Cited

 
69 O.S. 1709, 
Turnpike Revenue Bonds
Discussed at Length

 
69 O.S. 1710, 
Securing Bonds by Trust Agreement
Cited

 
69 O.S. 1718, 
Judicial Determination of Validity of Bonds
Discussed at Length

 
69 O.S. 1901, 
Liberal Interpretation
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA